FILED

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

00 MAR 15 PM 2:18

U.S. DISTRICT COURT
N.D. OF ALABAMA

MARK D. DEMPSEY,           )
                          )
        Plaintiff,         )
                          )
v.                        )        Case No. CV 98-TMP-2265-NE
                          )
STATE OF ALABAMA DEPARTMENT )
OF CORRECTIONS, *et al.*,    )
                          )        ENTERED
        Defendant.         )
                          )        MAR 1 5 2000

## MEMORANDUM OPINION

This action is before the court on the defendants' motion for
summary judgment, filed September 13, 1999.  Plaintiff Mark Dempsey
responded to the motion for summary judgment on October 12, 1999,
by filing a memorandum and supporting exhibits, and the defendants
replied.   Pursuant to a stipulation filed February 1, 2000, the
parties have consented to the exercise of jurisdiction by the
undersigned pursuant to 28 U.S.C. § 636(c).  Having considered the
briefs and the evidence submitted by the parties, the court enters
this memorandum opinion.

## I. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment
is proper "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the



affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ.

-2-

P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings.  <u>Celotex</u>, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Id</u>. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id</u>. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  <u>Id</u>. at 249.  His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every

inference but only of every reasonable inference.  <u>Brown v. City of</u>

<u>Clewiston</u>, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  UNDISPUTED FACTS

Viewing the evidence most favorably to the plaintiff, the
following facts are pertinent to defendants' motion.  Mark Dempsey,
the plaintiff, was hired by the Alabama Department of Corrections
(ADOC) in April of 1990 as a corrections officer at the Limestone
Correctional Facility ("Limestone") in Capshaw, Alabama.  About a
year later, in April of 1991, Dempsey was assigned to work in
Limestone's institutional armory, where he was responsible for the
weapons, security devices, and farm implements used by the officers
who supervised farm workers and chain gangs.  The armory is a
building separate from the prison housing complex and is located
outside the perimeter security fence.  Each day, the corrections
officers assigned to supervise the prisoner work squads report to
the armory to check out their equipment, and return at the end of
their shifts to turn in the equipment.  During good weather, the
officers may spend 15 to 30 minutes at the armory twice a day.
During inclement weather, the officers may spend several hours of
their shift inside the armory.  During the years when Dempsey
worked in the armory, the supervisor over the farm squads was

-5-

defendant Jim Ed Gates.   For a short time during 1995, Dempsey reported directly to Gates.   At all times relevant to this case, Gates outranked Dempsey, and Gates had the power to give Dempsey orders.

In spite of the armory's location away from the main prison, the prison wardens visited the armory at least once a week.   When Dempsey first began to work as armorer, Warden J.D. White was Dempsey's immediate supervisor.   Dempsey was later supervised by Warden Stephen Dees, who usually visited the armory every day.   After Dees left the prison, Ralph Hooks, as assistant warden, became Dempsey's immediate supervisor.   Hooks usually spent 10 to 15 minutes in the armory once a week.   Later in 1995, David Wise became a captain over the chain gangs, and he supervised both Gates and Dempsey.   While Wise was captain, he was in the armory almost every day.   Hooks was named warden in March of 1997, and David Wise became assistant warden.   Wise remained as Dempsey's immediate supervisor and continued to visit the armory on a daily basis.

While Dempsey was employed by the ADOC, he attended at least two training sessions in which sexual harassment was the topic; one was held in 1993 and one in 1994.   Dempsey also attended a training session concerning administrative regulations in 1993, 1994, and 1996.   In addition, the ADOC regulations were available at

-6-

Limestone for employees to inspect. The regulations include Administrative Regulations 206 and 213.

Regulation 206, dated August 4, 1995, and effective September 1, 1995, ensures that the ADOC will provide a procedure for "presenting complaints concerning allegations of differential treatment based on race, color, religion, sex, age, national origin, or disability," and names wardens as EEO officers, responsible for "seeking equitable solutions" to prevent discrimination.[1] This regulation does not specifically address sexual harassment.

Regulation 206 was superceded by a new Regulation 206, dated October 4, 1996, to include Annex C, the ADOC's sexual harassment policy and to "emphasize[] EEO complaint procedures."[2] The amended regulation defines sexual harassment as "any unwelcomed sexual

_____

[1]     The regulation also names "wardens/staff heads" as EEO counselors. The defendants do not define staff heads. In any event, because the EEO officer, which is the warden, is responsible for "receiving, investigating, and participating in the complaint process to assist in resolving internal complaints of alleged discrimination," this provision appears to be the only provision relevant to defendants' motion. Defendants assert that Mickey Kirkland was Limestone's EEO counselor, but they do not provide any documentation in support of that contention, which contradicts the plain language of the relevant regulation.

[2]     The copy of the superceding Regulation 206 provided by defendants is incomplete. It appears that the even-numbered pages have not been included.

advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." The policy further states that sexual harassment includes, among other conduct, "unwelcomed sexually oriented communication" and "unnecessary touching of an individual." The policy further states that complaints of sexual harassment are taken by the ADOC with the "utmost seriousness," and that "[a]ll complaints of sexual harassment must be investigated promptly, impartially and confidentially." The policy neither addresses nor excludes same-sex harassment.

Regulation 213 governs the filing of complaints and grievances. The version of Regulation 213 dated September 8, 1993, requires the complaining employee to present a grievance to the EEO Officer/Counselor, "promptly", either verbally or in writing. Verbal complaints "should be followed up in writing" if the complaint is to be "formally" pursued. The regulation further provides for the complaining employee to report the incident to an EEO officer in the Central Office if he feels "intimidated or uncomfortable" reporting to an official in the institution.[3]

---

[3] The regulation does not specify who the EEO officer in the Central Office is, or where he may be reached. Defendants contend that the EEO officer in Montgomery was Robert Hodge, and Dempsey admits he knew of Hodge before he resigned.

Dempsey continued to work in his position as institutional armorer until he resigned in August of 1997.  During that time, he had contact at least twice a day, virtually every day, with defendant Gates.  Gates supervised the farm squads from at least 1991 through 1997, and became a lieutenant at some time between 1992 and 1994.  He held that position until after the instant action was filed.  As a lieutenant Gates had authority over Dempsey.  Dempsey was required to follow any orders given by Gates. Furthermore, Gates had the power to provide assessments of Dempsey's performance as a corrections officer and was able to recommend disciplinary actions and commendations that would affect Dempsey's performance evaluations and pay raises.  In letters of commendation written by Gates to Dempsey, Gates stated that he was in Dempsey's "chain of command" and that officers like Dempsey were a "pleasure to supervise."  In his deposition, Gates stated that Dempsey "worked for" him.

Dempsey first met Gates in May of 1990, the week that Dempsey graduated from the police academy.  One of Dempsey's classmates was Gates' brother.  On the night following the graduation ceremony, Dempsey, Gates' brother, Gates, and other ADOC employees shared a hotel room.  Gates came into the hotel room after drinking heavily and got into the bed where Dempsey was resting.  Gates put his arms

-9-

around Dempsey and began to caress him.  Dempsey got out of the bed
and spent the night in a chair.

A year later, when Dempsey began working as the armorer at
Limestone, he began to have daily contact with Gates.  Beginning in
1991, Gates called Dempsey his "girl," "baby," "gal," or "fuckboy."
Gates also told Dempsey that he was pretty, winked, and blew kisses
at him, and asked Dempsey to "walk nasty" or "priss" his "ass."
Dempsey has stated that these references were made on a daily
basis.[4]   Gates also asked Dempsey to give him some "ass" or
"pussy."   On one occasion when Dempsey returned to work after
taking a sick day, Gates admits he asked another officer, "Did you
tear her?"  Gates admits that Dempsey told Gates to quit, and said
such talk wasn't "natural."  Dempsey's response to Gates' frequent
comments or physical contact was to tell him to quit, and to tell
him that such behavior was unnatural.[5]

On a frequent basis over the next several years, Gates prodded
Dempsey in the anal area with his baton, his hand, the metal handle

---

[4]     Gates denies having used many of these terms, but admits
he used homosexual slang in the armory, and says all of the
officers talked that way.  He admits he may have winked at Dempsey,
and told him to "walk nasty."

[5]     Gates further claims that Dempsey laughed about the
incident.

of a fly swatter, pliers, a socket wrench, and other objects.  The "prodding" became more frequent, intense, and intrusive over time, and Dempsey claims that on more than one occasion, Gates prodded his anus with objects forcefully enough to cause severe pain.  On at least two occasions, Gates' prodding caused Dempsey's hemorrhoids to bleed profusely.

Dempsey alleges that frequently the anal prodding extended to Dempsey's scrotum, and included stroking or caressing.  In addition, Gates often confronted Dempsey as Gates came out of the bathroom, but before Gates zipped his pants.  Gates would zip his pants while looking at Dempsey, and would make verbal sexual references while zipping up his pants.  At other times in the armory, Gates took a sharpened pocket knife, forcibly held Dempsey by the arm, and cut hair from Dempsey's arm, telling Dempsey that he (Gates) liked his "women" with less hair.  While holding the knife to Dempsey's arm, Gates would tell Dempsey that if he moved, he would cut him.  Gates also held the knife to Dempsey's buttocks and genitals, and stroked or prodded those areas with the dull side of the knife.  The incidents involving the knife occurred as often as twice a week during the last two years of Dempsey's employment at Limestone.  Dempsey testified that he rebuffed all of Gates'

advances, and that many times Gates would react angrily after Dempsey rejected him, and would make threats toward Dempsey.

While in the armory, Gates frequently told vulgar jokes with homosexual themes.  He stated that he wanted to "suck a dick" before he died, and often said that he preferred anal sex.  Gates often asked Dempsey to go on weekend trips with him, promising him that they would have a "good time."  Dempsey admits that Gates never said he was a homosexual, and Dempsey never saw Gates engage in overt sexual conduct.  However, Dempsey heard Gates tell stories about going to bars where transvestites were present, and he believed, based on Gates' language and conduct, that Gates was a homosexual.  Gates denies that he is a homosexual, but admits that he used homosexual language, and played homosexual "games" in the armory.

A few of the incidents described by Dempsey were witnessed by another officer, Mark Pelzer.  Pelzer stated in an affidavit that on February 25, 1997, he heard Dempsey call out as if in pain and say "quit."  Pelzer then saw Gates extract a pair of pliers from Dempsey's buttocks, smile and walk away.  In August of 1997, Pelzer saw Gates stroke Dempsey's anal and scrotal area with his hand, and prod the anus with his fingers.  Pelzer heard Dempsey tell Gates to stop, and saw that Gates laughed in response.  Pelzer recommended

-12-

that Dempsey complain to Warden Wise.  On a third occasion, Pelzer saw Gates prod Dempsey with the handle of a metal fly swatter. Pelzer saw Dempsey jump and scream in pain, and heard Dempsey tell Gates that he had hurt him and that he was tired of Gates' sexual harassment.  Pelzer further stated that Gates similarly prodded other officers in the anus with his baton, and referred to other male officers as "honey," "baby," or "sweet thing."

Dempsey said the conduct of officers "goosing" each other with batons was a common occurrence, and took place on a regular basis in the armory, where wardens frequently visited.  In addition, Warden Wise was present on at least one occasion of prodding by Gates against Dempsey, and on another occasion when Gates aimed a gun at Dempsey.

Pelzer has observed Gates interacting with female officers, and stated that Gates did not engage in the prodding or name-calling with female officers.  Dempsey also stated that Gates treats female officers with respect, and does not address female employees in derogatory or sexual terms.  Only one female employee worked as a farm officer during Dempsey's employment at the armory. Dempsey admits that off-color jokes were told around the female worker, but that she didn't seem to mind.

-13-

Dempsey first complained about Gates' conduct in 1992 to Warden White, who is now deceased.  At that time, Dempsey did not describe the actions as sexual harassment, but reported that Gates was harassing him by prodding him with his hands and a knife and by calling him feminine names.  The harassment continued, and in July of 1996, Dempsey complained to then-Warden Hooks, a defendant in this action.  Dempsey told Hooks that Gates had been harassing him since he began working at Limestone.  Later in July of 1996, Dempsey again complained to Hooks, and was told not to worry about the situation.  Pelzer and Dempsey then approached defendant Wise about Gates, and Dempsey told Wise that he was afraid that Gates would injure or kill him.  In August of 1996, Dempsey again complained to Wise that Gates was "a bully and a thug," and was "overbearing, intimidating, [and] harassing."  Dempsey did not label the conduct as sexual harassment, but told Wise that Gates had humiliated, mistreated, and assaulted him.  He also told Wise that Gates demeaned him and reported that Gates' had prodded him in the anus with the baton and other objects.

In October of 1996, Dempsey again complained to Wise about Gates' conduct, and for the first time specifically labeled the conduct as sexual harassment.  Wise had entered the armory and found Dempsey upset and sobbing.  Dempsey told Wise that Gates had

-14-

sexually harassed him, and that he planned to file an EEOC charge. Wise laughed at him, and said that he would "talk to" Gates and would fire Gates if Gates assaulted Dempsey.   Dempsey further testified that he asked Wise what he would do if Gates killed him, and Wise laughingly said he would fire Gates.   Wise asked Dempsey to let him handle the complaint without resorting to the EEOC. Later the same day, Dempsey told Hooks that Gates was sexually harassing him and that Dempsey would complain to the EEOC if the harassment did not stop.   Dempsey did not file a written complaint at that time, upon assurances that Wise would "handle it."

Gates continued to frequent the armory after the complaint. Several days after Dempsey first characterized the harassment as sexual, Wise set up a meeting with Gates and Dempsey.   At the meeting, Wise told the men that they both were "good officers," and that he hated to have to discipline either one of them.   Wise further said that the two men needed to get along.  Wise testified that he was "ready to get rid of both of them" because he was fed up with their "childish crap."  Wise further told both men that he would hate to reassign them to duties inside the main prison. Dempsey considered this to be a threat, because work inside the prison was much less desirable work than assignments outside the perimeter.

Wise did not confront Gates with Dempsey's allegations of sexual harassment and sexual assault nor did he ask Gates whether he had engaged in the conduct complained of; instead Wise urged them to work together and get along.  Dempsey admits that he was given the opportunity to confront Gates with his allegations of sexual harassment, but that he chose not to do so.  At the meeting, Dempsey told Wise that he thought they could work together.  Wise then instructed Gates and Dempsey to hug.  Dempsey testified that Gates hugged him against his wishes.[6]

A few months after this meeting, Gates made the comment about "tearing" Dempsey, whom Gates called his "girl."  In February of 1997, Gates assaulted Dempsey with the pliers.  Also during that period, Gates pointed a gun at Dempsey and "dry-fired" the weapon while Wise was present in the armory.  On the same day, Gates attempted to grab Dempsey's genitals as Dempsey walked by.  Dempsey has described at least two other incidents in which Gates pointed a weapon, once at Dempsey and once at Pelzer.

On March 10, 1997, Gates held a knife to Dempsey's genitals, and stroked his buttocks and anal area with the backside of the

---

[6]     Wise disputes that Dempsey's complaint defined the harassment as sexual.  Both Wise and Gates have testified that Dempsey voluntarily hugged Gates, but for purposes of this motion, the court accepts Dempsey's version of the facts.

knife blade, then laughed at Gates.  On May 22, 1997,[7] Gates approached Dempsey from behind and forced a socket ratchet into his anal area, causing extreme pain.  Dempsey told Gates that he had hurt him.  Gates similarly assaulted Dempsey on August 6, 1997, using his fingers, and causing Dempsey's hemorrhoid to bleed.

At some time in the summer of 1997, Dempsey presented a written grievance to Wise complaining of sexual harassment.[8] Because Wise was on vacation at the time, Dempsey gave the grievance to Wise's secretary.  Wise returned from vacation within a week or two after the grievance was filed, and did not speak with Dempsey until "several days" after he returned from vacation. Dempsey understood that the grievance was supposed to be acted upon within a few days, in accordance with Administrative Regulations 213 and 206.  Dempsey testified that, consequently, he believed that the warden had failed to take action as required and that the "time had passed."  In response to the written complaint, Wise testified that he may have questioned some of the officers about Gates' conduct, and that Gates admitted hitting Dempsey in the

---

[7]    Ironically, this is the very date the Eleventh Circuit announced <u>Fredette v. Management Associates</u>, 112 F.3d 1503 (1997).

[8]    Both Wise and Hooks deny that Dempsey ever described Gates' conduct as sexual harassment.

buttocks with the baton.  Gates, however, said the incident was just "horseplay."  Wise did not advise Dempsey that he had conducted any investigation into the complaint, and defendants have offered no written account of any investigation.

Wise met with Dempsey about the written grievance several days after returning from vacation and asked Dempsey what he wanted Wise to do with the complaint.  Dempsey responded:  "Throw it away.  You ain't going to do nothing about it anyway."  Wise then put the grievance into the garbage can.[9]  According to Dempsey, Gates continued to harass Dempsey by prodding, poking, or gouging him in the anal area.

Gates was never disciplined as a result of any of the conduct about which Dempsey complained.  Wise never told Gates to stop calling Dempsey "girl" or using homosexual slang.  Gates was never reprimanded or disciplined for prodding Dempsey with the baton or other objects.  Wise admits that he knew about the name-calling and the officers hitting each other in the buttocks with batons, but that he chose not to make a "big deal" out of the conduct.

---

[9]    Wise testified that Dempsey wanted to withdraw his complaint, and that when Wise handed the written grievance to Dempsey, Dempsey put the paper into the garbage can.

On August 29, 1997, Dempsey resigned.   In his letter of
resignation, Dempsey made no reference to Gates or to harassment of
any kind.   The plaintiff sought administrative relief through the
Equal Employment Opportunity Commission after he resigned.   On
September 4, 1998, Dempsey filed the complaint that commenced this
action seeking redress pursuant to 42 U.S.C. § 1983 and Title VII,
42 U.S. C. § 2000e *et seq*.   He claims that he was subjected to a
hostile work environment caused by Gates' sexual advances toward
him, and that the defendants knew of the conduct and took no action
to prevent it.

### III.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, the defendants
have filed a motion for summary judgment seeking dismissal of both
plaintiff's Title VII and § 1983 claims.   Defendants assert that
the conduct complained of does not constitute sexual harassment,
and also assert that: (1) plaintiff's claims based on incidents
that occurred prior to September 3, 1996, are barred by the statute
of limitations set forth in Alabama Code § 6-2-38(1); (2) defendant
Joe Hopper is due to be dismissed because the complaint fails to

-19-

state a claim against him;[10] (3) defendants Hooks and Wise are entitled to summary judgment because they are not liable under the theory of *respondeat superior* and (b) all of the individual defendants are entitled to summary judgment because they are protected by qualified immunity; and (5) the ADOC is not liable because: (a) Gates' actions were not in the line and scope of his employment and (b) it adopted an anti-discrimination policy and offered plaintiff an avenue for redress, which plaintiff failed to follow.  In order to evaluate these claims, the court looks first to whether the conduct complained of could constitute actionable sexual harassment or a violation of Dempsey's equal protection rights, and next to whether the defendants have proven any affirmative defense.

## A.  Plaintiff's Title VII Claim

Title VII makes actionable sexual harassment so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment."   <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 786, 118 S. Ct. 2275, 2283, 141 L.Ed. 2d

---

[10]    Plaintiff concedes that Hopper is due to be dismissed. Therefore, by consent of the parties, the court finds that defendant's motion is due to be granted as to defendant Joe Hopper, and all claims against him are due to be dismissed with prejudice. A separate order will be entered in accordance with this finding.

662, 675 (1998)(quoting <u>Meritor Savings Bank v. Vinson</u>, 477 U.S.
57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986), in turn quoting
<u>Henson v. City of Dundee</u>, 682 F.2d 897, 904 (11th Cir. 1982)).
While not all sexual innuendo or flirtatious behavior gives rise to
a cause of action, when the workplace becomes "permeated with
discriminatory intimidation, ridicule, and insult that is
sufficiently severe or pervasive to alter the conditions of the
victim's employment and create an abusive working environment,
Title VII is violated." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S.
17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993).[11]

### 1. **Same-Sex Harassment**

The Supreme Court has made clear that "Title VII's prohibition
against discrimination 'because of ... sex' protects men as well as
women." <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75,
118 S. Ct. 998, 1001, 140 L. Ed. 2d 201 (1998). In <u>Oncale</u>, a male
employee working on an oil platform with an all-male crew
complained that he was forcibly subjected to sex-related,

---

[11]    Of course, the Title VII claim lies only against the
"employer" and not against plaintiff's co-workers. <u>See</u> <u>Busby v.
City of Orlando</u>, 931 F.2d 764 (11th Cir. 1991); <u>Yeldell v. Cooper
Green Hospital, Inc.</u>, 956 F.2d 1056 (11th Cir. 1992). Thus, insofar
as plaintiff attempts to assert a Title VII claim against Hooks,
Wise, and Gates, they are entitled to summary judgment.

humiliating actions, was physically assaulted in a sexual manner, and was threatened with rape.  When he brought the conduct to the attention of supervisors, he was told that the harassers "picked on" others as well.  The Court explicitly held that "same-sex sexual harassment is actionable under Title VII."  <u>Id</u>. at 1003.

While the Court in <u>Oncale</u> recognized that not all of the circuit courts of appeal have been clear in applying Title VII to same-sex harassment, it declared that such application of Title VII logically followed the language of the statute.  The Court relied upon well-founded opinions in the related context of race discrimination to hold that Title VII encompassed more than the most typical male-on-female or white-on-black discrimination.  Just as it is possible for an employer to discriminate against members of his own race, it is possible for an employee to be discriminated against because of his gender, even by an employer of the same sex.  <u>Id</u>., citing <u>Casteneda v. Partida</u>, 430 U.S. 482, 499, 97 S. Ct. 1272, 1282, 51 L. Ed. 2d 498 (1977); <u>Johnson v. Transportation Agency, Santa Clara Cty.</u>, 480 U.S. 616, 107 S. Ct. 1442, 94 L. Ed. 2d 615 (1987).  Furthermore, the Court made clear that same-sex harassment does not have to be initiated by a homosexual harasser to be actionable, because "harassing conduct need not be motivated by sexual desire."  <u>Oncale</u>, 118 S. Ct. at 1002.

-22-

In light of <u>Oncale</u>, it is clear that the sexual prodding and caressing at issue in the lawsuit is actionable as sexual harassment, so long as it is sufficiently "severe or pervasive." Under the standard set forth in <u>Harris</u>, the court should look for conduct that is both objectively and subjectively offensive. <u>Harris</u>, 510 U.S. at 20. In addition, the court should examine the frequency and severity of the offensive conduct, and should evaluate whether the conduct is physically threatening or humiliating, or merely offensive, and whether the conduct unreasonably interferes with the employee's work performance. <u>Id</u>. at 23.

The Eleventh Circuit Court of Appeals had occasion to examine claims of same-sex harassment a year before <u>Oncale</u> was decided. In <u>Fredette v. BVP Management Associates</u>, 112 F.3d 1503 (1997), the court deemed the harassment of a male employee by a male homosexual actionable, noting that even though the Supreme Court had not yet spoken on same-sex harassment, the "widespread acknowledgement of the viability of reverse-discrimination claims stands as an implicit rejection" of the defendant's position. While the Eleventh Circuit holding addressed conduct by a homosexual, the

court acknowledged that "the law is well established that Title VII protects men as well as women." Id. at 1509.[12]

As early as 1996, the Eighth Circuit Court of Appeals ruled even more broadly that same-sex harassment was actionable under Title VII. In Quick v. Donaldson Co., Inc., 90 F.3d 1372 (8th Cir. 1996), the court examined a situation similar to Dempsey's. In Quick, the plaintiff, a male factory worker, complained of a hostile work environment, claiming that other male employees subjected him to physical and verbal harassment. Id. at 1374. Quick complained of a practice at the factory known as "bagging," which was an act of grabbing or squeezing another man's testicles. Id. In addition to the bagging, which at times was merely making the grabbing motion, and at times involved actual pressure and bruising, Quick also complained that he was falsely labeled a homosexual and was subjected to taunts. Id. at 1374-75. The district court noted that the conduct was unwelcome and harassing,

---

[12]     The defendants argue that prior to Fredette, same-sex sexual harassment "was not a cognizable claim under Title VII or under 42 U.S.C. § 1983 in this Circuit." This argument is without merit, as Fredette merely explains the breadth of the existing statute, and does not expand the statute or create new law. Defendants' argument that Fredette does not apply here because, they claim, Gates is not a homosexual, is equally without merit. Gates conducted himself as if he were soliciting sex from Dempsey; as a result, the court sees his actual sexual preference as irrelevant.

but found the conduct to be based on personal dislike for the plaintiff and "hooliganism," not sex. Id. at 1376.

In Quick, the appellate court reversed the district court's order granting summary judgment in favor of the defendant, noting that the lack of "explicitly sexual" conduct does not preclude a finding of sexual harassment. Simply the fact that the conduct was aimed at sexual organs and involved sexual language gave rise to a fact question for the jury. Id. at 1379. The court further commented that the fact that the conduct may have been motivated by dislike rather than sexual desire does not prevent a finding that the conduct constitutes sexual harassment. Id. Finally, the court noted that summary judgment was improper where there was evidence from which "a fact-finder could reasonably conclude that the treatment of men at [the workplace] was worse than the treatment of women." Id.

Turning to the facts of the instant case, it is clear, in light of Oncale, that the fact that the harassment Dempsey complains of was committed by a male does not preclude his claim. There can be no doubt that if a male had been accused of making the same comments to and similarly groping and prodding a female, there would be sufficient evidence to support a Title VII claim. The conduct complained of was clearly sexual in nature and was directed

-25-

to male employees rather than female employees.  There are genuine issues of fact concerning Gates' conduct toward Dempsey, and a jury question exists as to whether that conduct was so "severe" or "pervasive" as to create an abusive and discriminatory working environment.

As in <u>Quick</u>, the conduct was both aimed at sexual organs and involved sexual language.  Even though Gates denies being a homosexual, the conduct was homosexual in nature, as in <u>Fredette</u>. Dempsey also has offered evidence to support the factors set forth in <u>Harris</u>.  Dempsey has presented evidence from which a fact-finder could conclude that the verbal harassment was pervasive in the armory and occurred daily.  If Dempsey is believed, the physical harassment was so severe that it caused serious pain and bleeding. Certainly, holding a knife to the genitals of another person is both objectively and subjectively offensive.  The conduct of Gates, as described by Dempsey, was both physically threatening, and, by any standard of decency, humiliating.  Dempsey has testified that the harassment ultimately caused him to leave his job.  Thus, the <u>Harris</u> inquiry is satisfied.

Not only does the court find that the relevant factors have been met and that a jury question is presented, but the court further notes that, even looking no further than the ADOC's

-26-

definition of sexual harassment, the conduct Dempsey complains of is actionable because it involves "unwelcomed sexually oriented communication" and "unnecessary touching of an individual," conduct specifically forbidden by ADOC's sexual harassment policy.  For all the reasons set forth above, the plaintiff has come forward with evidence sufficient to state a claim for sexual harassment under Title VII.

### 2.  Gates' Capacity As Supervisor

The ADOC's liability for Gates' conduct turns upon the issue of whether Gates was a supervisor.  Since the Supreme Court issued its opinions in <u>Faragher</u> and <u>Ellerth</u>, it has been clear that under Title VII an employer is vicariously liable for actionable discrimination caused by a supervisor, even in the absence of a tangible adverse employment consequence, and that the liability may be countered only where the defendant offers evidence sufficient to support an affirmative defense.  <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 780 (1998); <u>Burlington Ind. v. Ellerth</u>, 524 U.S. 742, 118 S. Ct. 2257, 151 L. Ed. 2d 633 (1998).

The court in <u>Faragher</u> held that an "employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or

-27-

successively higher) authority over the employee." 524 U.S. at 807. The imposition of such liability is sensible in light of the fact that "[t]he agency relationship affords contact with an employee subjected to a supervisor's sexual harassment, and the victim may well be reluctant to accept the risks of blowing the whistle on a superior." Id. at 803. Furthermore, the court recognized that "employers have greater opportunity to guard against misconduct by supervisors than by common workers" as well as a better chance to screen, train, and monitor the supervisory personnel. Id.

In Faragher, the victim of the harassment was a lifeguard for the City of Boca Raton, Florida. She reported to the lieutenants and captains who worked at the Marine Safety Headquarters, who in turn reported to the chief of the city's marine safety division. The chief reported to a recreation director, who reported to a parks superintendent, who reported to the city manager. Id. at 781. Even though the harassers in Faragher were relatively low-level managers,[13] far removed from the central administration of the

---

[13]     It appears that at least one of the "supervisors" in Faragher merely made out daily work schedules and oversaw work and fitness training, but had no hiring or firing authority. Faragher, 524 U.S. at 27, 79-80, citing the decision below, 864 F. Supp. 1552, 1563-64 (S.D. Fla. 1994).

city, the court imposed liability on the city.  The court noted
that the structure of the lifeguard station was a "paramilitary
configuration," in which the lifeguards were subject to the orders
given by the lieutenants and captains.  Id.

In the wake of Faragher, there have been no Supreme Court or
Eleventh Circuit opinions defining "supervisor" for purposes of
imposing vicarious liability, but plaintiff's counsel has noted
that other district courts have held that where the alleged
harasser is in a position which allows him or her to control the
daily activities of the plaintiff, or to train or give instructions
to the plaintiff, the harasser may be deemed a "de facto
supervisor."  See, e.g., Newtown v. Shell Oil Co., 52 F Supp. 2d
366, 372-73 (D. Conn. 1999); Grozdanich v. Leisure Hills Health
Ctr., 25 F. Supp. 2d 953, 970-73 (D. Minn. 1998); Hernandez v.
Jackson, Lewis, Schnitzler & Krupman, 997 F. Supp. 412, 417
(S.D.N.Y. 1998).  At the least, such facts give rise to a triable
issue of fact.  Grozdanich, 25 F. Supp. 2d at 970-73.

In the instant case, the facts belie defendants' denial that
Gates was Dempsey's supervisor.  Defendants admit that Gates was
Dempsey's immediate supervisor for a short period of time in 1995.
Defendants admit that throughout Dempsey's employment, Gates
outranked Dempsey, and Dempsey was required to follow Gates'

-29-

orders.   Gates had input into Dempsey's evaluations, raises, and promotions, even though he was not able to initiate such measures. Gates' own letters indicate that Gates was supervising Dempsey and was in Dempsey's chain of command.   Gates testified that Dempsey "worked for" him.   ADOC's Limestone facility, with its officers, captains, and lieutenants, resembles a paramilitary organization. To find that Gates was not a "supervisor," even though he was able to control Dempsey's work assignments by giving him direct orders and was able to influence his work performance evaluations, would fly in the face of the purpose of the vicarious liability standard that was designed to prevent "harm caused by the misuse of supervisory authority."   Ellerth, 524 U.S. at 765.   Consequently, pursuant to Faragher and Ellerth, the ADOC is vicariously liable for Gates' conduct, absent a sufficient showing that an affirmative defense applies to shield the ADOC.

### 3.   ADOC's Sexual Harassment Policy

The defendants argue that they are "insulated from liability" under Title VII because (1) the ADOC had adopted a written sexual harassment policy, providing a procedure by which the plaintiff could have complained, and because (2) the plaintiff failed to properly file a grievance.   In order to prevail on their summary

-30-

judgment motion, defendants must demonstrate the two elements of this defense: "([1]) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and ([2]) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S. at 765.

It is the first element that defeats these defendants. While the ADOC did promulgate a sexual harassment policy and provide a grievance procedure to its employees, it cannot be said that the ADOC "exercised reasonable care" to prevent Gates from harassing Dempsey or to correct the harassing behavior once it was reported. In reaching this conclusion, the court notes that Gates' conduct was widespread and open. Unlike most sexual harassment, it took place around other supervisors and co-workers. It occurred on a daily basis. It is clear that Wise knew or should have known of Gates' harassing conduct even before it was reported. It is also clear that neither Hooks nor Wise took action to correct the conduct after it was brought to his attention in 1996. When Dempsey complained, he received empty assurances and was made to feel as if he should accept or ignore Gates. In sum, Gates' conduct was tolerated, and Dempsey's complaints were ignored.

Consequently, the ADOC has failed to demonstrate that it "exercised reasonable care" to prevent or stop Gates' alleged harassment.

The court recognizes that the second element of the affirmative defense presents a closer call.  It could be argued that the plaintiff unreasonably failed to take advantage of the grievance mechanism provided by the ADOC in that the sexual harassment was never reported to the Montgomery EEO officer. However, the ADOC cannot escape the fact that Dempsey made the harassment known to at least two high-ranking officials at Limestone, and they not only failed to stop the harassment, but they took actions contrary to their own policy by not keeping the complaint confidential, by forcing a meeting between harasser and victim, and by failing to properly investigate the complaint. Therefore, even if the defendants were able to prove the plaintiff's failure to properly report the harassment, they still would not be entitled to summary judgment because the first element has not been met.

## B.  Plaintiff's § 1983 Claim

Dempsey has alleged a claim pursuant to 42 U.S.C. § 1983 against the individual defendants in their individual capacities, asserting that the defendants' failure to take prompt, effective

remedial measures to stop the harassment violated Dempsey's rights

protected by the Fourteenth Amendment.

The essential legal standards for this type of a claim were

expressed by the Eleventh Circuit Court of Appeals in <u>Cross v.</u>

<u>State of Alabama</u>, 49 F.3d 1490 (11th Cir. 1995), as follows:

> Appellees also allege a violation of their equal
> protection rights under the United States Constitution
> pursuant to 42 U.S.C. § 1983, based upon [a supervisor's]
> sexual harassment. Appellees have a constitutional right
> to be free from unlawful sex discrimination and sexual
> harassment in public employment. <u>E.g.</u>, <u>Davis v. Passman,</u>
> 442 U.S. 228, 235, 99 S. Ct. 2264, 2271, 60 L. Ed. 2d 846
> (1979).
>
> In order to establish a violation of the Equal Protection
> Clause, appellees must prove discriminatory motive or
> purpose. <u>Whiting v. Jackson State University</u>, 616 F.2d
> 116, 122 (5th Cir. 1980). The court in <u>Whiting</u> held that
> "such intent should be inferred in the same manner as
> [the Supreme Court] said it is inferred under [42 U.S.C.
> § 2000-5]." <u>Whiting</u>, 616 F.2d at 121. "When section
> 1983 is used as a parallel remedy for violations of
> section 703 of Title VII [42 U.S.C. § 2000e-2], the
> elements of the two causes of action are the same."
> <u>Hardin v. Stynchcomb</u>, 691 F.2d 1364, 1369 n. 16 (11th
> Cir. 1982) (citing <u>Whiting</u>, 616 F.2d at 123).

<u>Id</u>. at 1507-1508. As discussed in Section III A 3, *supra*, Dempsey

has come forward with evidence sufficient to sustain a Title VII

claim. In this case, the same facts give rise to a claim that

Dempsey's constitutional rights were violated, and because the

employer in this case is a state actor, the action may be brought pursuant to § 1983.

### 1.  ADOC's Liability

Unlike Title VII, however, § 1983 liability cannot be predicated merely on *respondeat superior*. Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct 2018, 56 L. Ed. 2d 611 (1978). Rather, for the Alabama Department of Corrections[14] to be liable for Gates's conduct under § 1983, the plaintiff must show an affirmative link between the constitutional violation and some act or omission of the ADOC itself.  The ADOC is liable only if some policy, practice, or custom promulgated or accepted by the Department motivated Gates' behavior.  Stated another way, the driving or motivating force behind the offending conduct must be the official policy, practice, or custom of the ADOC.  Id.  It need not be an officially promulgated policy, but it must be, at least, a known practice or custom so well settled and acquiesced in by the ADOC as to constitute its policy.  See Brown v. City of Fort Lauderdale, 923 F.2d 1474 (11th Cir. 1991).

---

[14]  Dempsey has named the ADOC as a defendant, but has not specifically alleged a § 1983 claim against the ADOC.  However, because it is not entirely clear whether the 1983 claim is asserted against the ADOC, the court explains why such a claim would not be viable in this case.

This, of course, is where any § 1983 claim against ADOC must fail.   There is no evidence that ADOC officially promulgated a policy condoning any type of sexual harassment, much less of the sort described by the plaintiff.   There also is no evidence that the ADOC was aware of the harassment allegedly being carried out by Gates until the EEOC charge was filed in 1997.   In fact, Dempsey admits that he failed to report the harassment to anyone in Montgomery or to anyone ranking higher than the warden at Limestone.   There is no evidence that the ADOC tolerated long-standing or widespread abuse that was known to it.   Absent that acquiescence in the illegal conduct, and because the ADOC's policies, practices, or customs did not motivate the conduct, the Department is not liable under § 1983.   The motion for summary judgment should be granted insofar as it seeks dismissal of the § 1983 claim against the ADOC.

### 2.  **Liability of the Individual Defendants**

The claims against the other defendants individually, however, stand on an entirely different footing.   There is substantial evidence that Gates used his position under state law, as a supervisor at Limestone, to engage in a long-standing campaign of sexual harassment against Dempsey, and perhaps other male

-35-

employees. Even though Gates was not Dempsey's immediate supervisor during most of the time that the conduct took place, Gates remained in authority over Dempsey, claimed to be in Dempsey's chain of command, and was able to influence Dempsey's job evaluations. Gates made comments that could be interpreted to mean that Dempsey stood to be rewarded or punished, depending on whether he accepted or rejected Gates' sexual advances. Plaintiff, therefore, has presented substantial evidence of a violation of his constitutional rights by Gates sufficient to support a § 1983 action, and defendants' motion for summary judgment on the § 1983 claims against Gates is due to be denied.

Dempsey also seeks to impose liability on Wise and Hooks. Because the *respondeat superior* theory is unavailable to the plaintiff in a § 1983 action, Dempsey must prove that the supervisors either personally participated in the harassment, or that there is a causal connection between the supervisors' acts and the deprivation of plaintiff's constitutional right to be free of sexual harassment. The plaintiff has offered evidence that the conduct at issue in this case was widespread and long-standing, and that both Hooks and Wise knew of the conduct no later than October 24, 1996. Dempsey has stated that Wise was present in the armory during some of the events that gave rise to this action and

-36-

that Hooks visited the armory on a frequent basis.  Furthermore,
the plaintiff has asserted that he specifically told Wise and Hooks
that Gates was sexually harassing him and that the defendants did
nothing.   While Wise alleges that he "may" have conducted some
cursory interviews, Hooks admits he employed no investigation into
Dempsey's complaint.   It is undisputed that neither defendant
instituted  any  corrective  action.    Plaintiff  has,  therefore,
offered enough evidence that a reasonable juror could infer that
Hooks and Wise either acquiesced in Gates' conduct or that their
actions in failing to take remedial actions were a cause of the
continued harassment.  Consequently, Dempsey's § 1983 claims are
supported by substantial evidence and the defendants' motion for
summary judgment on the § 1983 claims against Hooks and Wise is due
to be denied.

### 3.  **Statute Of Limitations**

The defendants raise the affirmative defense that the claims
are time barred by the two-year statute of limitation applicable to
§ 1983 claims.  The limitation period begins to run from the date
of the accrual of the cause of action, which, for § 1983 purposes,
is the date the plaintiff knew or should have known of the legal
injury and its connection to a violation of her rights.  <u>Lavellee</u>

v. Listi, 611 F.2d 1129 (5th Cir. 1980).[15]   Hostile environment

cases, even under the equal protection clause of the Fourteenth

Amendment, are necessarily "continuing violations," that is, a

single, unitary cause of action made up of a series of discreet

events of harassment.   The denial of equal protection arises from

the sexually hostile work environment created by frequent,

repeated, and severe harassment.   The repeated events of harassment

are merely the elements that make up the totality of the hostile

environment, which is itself the basis of the cause of action.

See, generally, Vance v. Southern Bell Telephone and Telegraph Co.

863 F.2d 1503 (11th Cir. 1989).   In Vance the court explained:

> Those cases [Henson v. City of Dundee, 682 F.2d 897 (11th
> Cir. 1982) and Meritor Savings Bank v. Vinson, 477 U.S.
> 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)] held that an
> actionable harassment claim must establish by the
> totality of the circumstances, [sic] the existence of a
> hostile or abusive working *environment* which is severe
> enough to affect the psychological stability of a
> minority employee.   The prima facie showing in a hostile
> environment case is likely to consist of evidence of many
> or a very few acts or statements by the defendant which,
> taken together, constitute harassment.   [Italic in
> original].

---

[15]     In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th
Cir. 1981)(*en banc*), the Eleventh Circuit adopted as binding
precedent the decisions of the old Fifth Circuit Court of Appeals
rendered before October 1, 1981.

Id. at 1510.  For statute of limitations purposes under § 1983, the
question is whether the hostile environment, and the events that
create it, continue into the limitation period.  There is not a
separate cause of action, and, therefore, separate limitation
period, for each individual event of harassment.  There is but one
limitation period, and it runs from the date of the last event of
harassment because, as the last event, it marks the end of the
hostile environment and the full accrual of the cause of action.

The court has little difficulty concluding that Dempsey's
claims were timely filed within the two-year limitation period.[16]
Dempsey described events of harassment occurring as late as August
of 1997, well within two years prior to the filing of suit in
September of 1998.  The fact that some of the events of harassment
he relies upon occurred more than two years before the filing of
suit does not make it untimely.  As explained above, the claim is
for a sexually discriminatory and hostile work environment made up
of several discreet though related instances of harassment, all of

---

[16]    Although defendants' arguably raise the statute of
limitations defense only in reference to the § 1983 claim, any such
defense would be equally inapplicable to the Title VII claim,
because the "continuing violation" theory provided that plaintiff's
time for filing his EEOC claim and, subsequently, his lawsuit, did
not begin to run until the last act of harassment, in August of
1997.

which are but elements of the single claim.  Therefore, defendants'
motion for summary judgment on the issue of the time-bar is without
merit.

### 4. Qualified Immunity

Defendants Hooks and Wise have asserted that they are entitled
to qualified immunity as a shield from plaintiff's § 1983 claims.[17]
Under federal law, it is well settled that qualified immunity
protects government officials performing discretionary functions
from civil suit, and from liability, where their conduct does not
violate "clearly established statutory or constitutional rights".
Lassiter v. Alabama A & M Univ., 28 F.3d 1146,1149 (11th Cir.
1994)(citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct.
2727, 2738, 73 L. Ed. 2d 396 (1982))(additional citations omitted).
Furthermore, it is the general rule that qualified immunity will
protect government actors from liability, and only in "exceptional
cases" will the immunity be unavailable as a shield.  Id.  Even so,
qualified immunity does not apply in those instances where the law
has been "developed in such a concrete and factually defined
context to make it obvious to all reasonable government actors, in

---

[17]   Apparently Gates does not press qualified immunity as a
ground for granting him summary judgment on plaintiff's § 1983
claim.

the defendant's place," that the actions violate federal law.  Id.
It is not necessary that the facts of the cases relied upon as the
"clearly established law" be the same as in the instant case, but
they "do need to be materially similar".  Id. at 1150.

As to Hooks' and Wise's entitlement to qualified immunity, the
important issue is whether the defendants reasonably should have
known that their failure to prevent or correct Gates' conduct
violated "clearly established law."  The defendants frame this
issue as whether the Eleventh Circuit had clearly ruled, prior to
October 24, 1996, that same-sex harassment presented a cognizable
claim.[18]  First, it should be noted that the Eleventh Circuit spoke
to the precise issue of male-on-male harassment in Fredette on
May 22, 1997, three months before Dempsey resigned from the ADOC.
More importantly, Fredette had clearly established that male-on-
male harassment was actionable under Title VII before plaintiff
presented his written grievance to Wise during the summer of 1997.
Certainly, Wise should have been aware that he was obligated by
Title VII to prevent or correct Gates' harassment of plaintiff and
that failure to do so could expose him to liability under § 1983.

---

[18]    Defendants further attempt to narrow the issue in such a
way that, without evidence that Gates is a homosexual, his advances
cannot have been deemed actionable even after the Eleventh
Circuit's opinion in Fredette.

-41-

See Cross v. State of Alabama, 49 F.2d 1490 (11th Cir. 1995)(rejecting qualified immunity for supervisor who failed to correct harassment by a subordinate). Once the Eleventh Circuit announced Fredette, making clear that male-on-male harassment was actionable, the law was clearly established for purposes of qualified immunity. Wise's failure to take steps to correct the harassment of Dempsey during the summer of 1997 is not shielded by qualified immunity.

Hooks' claim to qualified immunity is subject to closer scrutiny. Until Fredette was announced on May 22, 1997, the law was not "clearly established" in the Eleventh Circuit that same-sex harassment was actionable under Title VII. The complaints made to Hooks all occurred prior to Fredette, before the law of same-sex harassment was clearly established. However, the nature of Dempsey's complaints created a situation in which Hooks, as of May 22, 1997, had a duty to take action to prevent or correct the harassment. Dempsey told Hooks in July of 1996 that Gates' conduct had been continuous since Dempsey began working with Gates. Again in July of 1996, Dempsey told Hooks that the conduct was ongoing. In October of 1996, Dempsey again complained and specifically labeled the ongoing harassment as sexual. Even so, after May 22, 1997, Hooks did nothing to investigate Dempsey's claims, even

-42-

though it was clearly established that such conduct was violative of Title VII.  Consequently, neither Hooks nor Wise is entitled to qualified immunity.[19]

## IV.  CONCLUSION

Accordingly, consistent with the foregoing discussion of the evidence presented by both parties in support of and in opposition to the competing motions for summary judgment, this court determines:

1.    That defendants' motion for summary judgment is due
      to be granted as to defendant Hopper;

2.    That defendants' motion for summary judgment on
      plaintiff's Title VII claim against the ADOC is due
      to be denied, but granted as to the individual
      defendants.

---

[19]    Although Gates has not sought summary judgment on qualified immunity, he would not be entitled to it for the same reasons Wise is not.  He continued to harass Dempsey even after Fredette clearly established that it violated Title VII.

-43-

3.    That defendants' motion for summary judgment on plaintiff's § 1983 claim against the ADOC is due to be granted.

4.    That defendants' motion for summary judgment on plaintiff's § 1983 claim against Hooks, Wise, and Gates is due to be denied.


A separate order will be entered in accordance with the findings set forth herein.

Dated this 15th day of March , 2000.


_____
T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE

-44-